# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**DONALD A. LAMBERT,**

      **Plaintiff,**

**v.**                                  **Case No.: 2:17-cv-00616**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' briefs wherein they both request judgment in their favor. (ECF Nos. 10, 15).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the presiding District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 10); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF

No. 15); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

## I.      <u>Procedural History</u>

On March 13, 2013 Plaintiff Donald Allen Lambert ("Claimant") filed an application for DIB, alleging a disability onset date of May 7, 2012 due to "Lower back surgery still have nerve damage and bulging di [disks], nerves, arthritis, depression, difficulty walking, standing, sitting, carpal tunnel both hands, thyroid problems [and] acid reflux." (Tr. at 186, 224). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 112, 120). Claimant filed a request for an administrative hearing, which was held on April 14, 2015 before the Honorable Carrie Bland, Administrative Law Judge. (Tr. at 29-83). By written decision dated August 12, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 12-23). The ALJ's decision became the final decision of the Commissioner on November 18, 2016, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 4 & 5). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 10), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 15). Accordingly, the matter is fully briefed and ready for resolution.

## II.     <u>Claimant's Background</u>

Claimant was 46 years old at the time he filed the instant application for benefits, and 48 years old on the date of the ALJ's decision. (Tr. at 12, 41). He has an eleventh

grade education and communicates in English. (Tr. at 223, 225). Claimant previously worked as a truck driver in the mining industry. (Tr. at 35, 225).

## III.     Summary of the ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments

prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the

evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through December 1, 2018. (Tr. at 14, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had engaged in substantial gainful activity from May 2012 through March 2013 and from April 2014 through January 2015. (Tr. at 14-15, Finding No. 2). The ALJ observed that Claimant's employment after the alleged disability onset date provided a basis on which to deny his application for benefits; nonetheless, the ALJ continued the disability determination process by advancing her analysis to the next step.

At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "Spine Disorder; Major Joint Dysfunction, [and] Obesity." (Tr. at 15, Finding No. 3). The ALJ considered and found non-severe Claimant's hyperlipidemia, hypertension, hypothyroidism, gastroesophageal reflux disease [GERD], depression and anxiety. (Tr. at 15-17). Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 17, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except can never climb ladders, ropes, and scaffolds; can occasionally climb ramps or stairs; and occasionally balance, stoop, kneel, crouch, or crawl. Can frequently reach, handle, and finger.

(Tr. at 17-21 Finding No. 5).

At the fourth step, the ALJ found that Claimant was unable to perform any past relevant work. (Tr. at 21, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 21-22, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1966 and was defined as a younger individual on the alleged disability onset date; (2) he had a limited education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of transferable job skills. (*Id.,* Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy, including unskilled work as a cashier, price marker, or hand packer at the sedentary exertional level. (Tr. at 22, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act and was not entitled to benefits. (Tr. at 23, Finding No. 11).

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant asserts nine assignments of error, although several are interrelated. First he claims that the ALJ erred by failing to "properly consider and make a record of" Claimant's dizzy spells, depression, anxiety, difficulty grasping and holding items, sleep disorder, episodes of decompensation, and pain. (ECF No. 10 at 2-5). Next, he claims

that the ALJ failed to give sufficient weight to the RFC opinions of Dr. Ignatiadis and Dr. Beckett, who are treating physicians. (*Id.*). Along that same line, Claimant contends that the ALJ erred when she failed to pose hypothetical questions to the vocational expert that accounted for all of Claimant's limitations and then failed to accept the vocational expert's opinions given in response to questions that included limitations advanced by Dr. Ignatiadis and Dr. Beckett. Finally, Claimant asserts that the ALJ improperly considered and inadequately explained the reason for her finding that Claimant did not meet Listing 1.04. (*Id.* at 5).

In response, the Commissioner points to the ALJ's finding that Claimant engaged in substantial gainful activity during significant periods of time after the alleged disability onset date; arguing that this finding, alone, was enough to deny Claimant's application for benefits, regardless of any alleged errors made by the ALJ. (ECF No. 15 at 12). Nevertheless, the Commissioner addressed Claimant's other arguments, stating that the ALJ properly weighed the medical source opinions, explained her rationale for rejecting certain statements, performed an adequate analysis of Claimant's mental limitations, fully and fairly evaluated Claimant's allegations of pain and explained her reasons for finding Claimant's descriptions to be less than completely reliable, and conducted a proper review of Claimant's signs and symptoms against the criteria of Listing 1.04. (ECF No. 15 at 12-20).

## V.  **Relevant Medical History**

The undersigned has reviewed the transcript of proceedings in its entirety, including the medical records in evidence. The following summary of Claimant's treatment and evaluations is limited to those entries most relevant to the issues in dispute.

### A. Treatment Records

On May 27, 2011, Claimant presented to C. D. Beckett, D.O., for treatment of hypertension, anxiety disorder, GERD, obesity, and obstructive sleep apnea. (Tr. at 502-06). Claimant was able to control his blood pressure with medication. He reported symptoms of anxiety that waxed and waned in severity, but were essentially unchanged from his last visit. Claimant also reported that his GERD symptoms remained the same. A review of systems was negative, as was a physical examination. Dr. Beckett assessed Claimant with essential hypertension, hyperlipidemia, and obstructive sleep apnea.

Claimant returned to Dr. Beckett on August 24, 2011, for follow-up of hypertension, anxiety, obesity, fatigue, and obstructive sleep apnea. (Tr. at 507-11). Claimant had no additional complaints. Dr. Beckett noted that Claimant's blood pressure was well controlled with medication. Claimant reported that since his last office visit, his anxiety, which waxed and waned, had not changed, nor had his condition of GERD. Claimant told Dr. Beckett that although he was compliant with his medications, he found it very hard to comply with recommended dietary and exercise guidelines. A review of systems was negative. On examination, Claimant appeared alert and in no distress, demonstrating a normal mood and appropriate affect, and he had unremarkable physical findings. Dr. Beckett assessed Claimant with essential hypertension, hyperlipidemia, and obstructive sleep apnea. Claimant's medication regimen included Benicar, Ibuprofen, Klonopin, Neurontin, Omeprazole, and Augmentin. He was advised to return in one month and did so on September 21, 2011. (Tr. at 514-516). At this visit, Claimant had no new complaints. His hypertension remained fairly well controlled with medication, and his anxiety and GERD symptoms had not changed since his last visit.

On October 24, 2011, Claimant returned to Dr. Beckett. (Tr. at 517-19). His review of systems was negative, other than a complaint of tingling and/or numbness and loss of balance. Claimant's physical examination was normal. Neurologically, sensation was intact to light touch of the feet. Claimant presented with a normal mood and appropriate affect. Dr. Beckett assessed Claimant with essential hypertension, hyperlipidemia, and obstructive sleep apnea. He was counseled to reduce his caloric intake and return in four months. However, Claimant returned to Dr. Beckett one month later on November 23 for follow-up. (Tr. at 520-22). His review of systems and physical examination were unchanged from his last visit. Claimant underwent an x-ray of the lumbar spine that same day at Williamson Memorial Hospital. (Tr. at 526). The x-ray revealed mild degenerative disc disease at L1-2 and L3-4, mild developmental changes, and mild arthropathy suspected at the L5-S1 facets, more on the right than the left; however, there were no fractures, acute bony abnormalities, or subluxations.

On December 3, 2011, Claimant presented to Thomas Memorial Hospital for an MRI of the lumbar spine due to brachial neuritis, not otherwise specified, as ordered by Dr. Beckett. (Tr. at 325-26, 464-65). The MRI revealed right neural foraminal disc herniation at L5-S1, bilateral neural foraminal stenosis due to chronic changes at L4-5, and a lesser degree of spondylosis at other levels that were secondary to chronic changes.

On December 28, 2011, Claimant returned to Dr. Beckett complaining of low back pain that was ongoing for months, as well as joint pain. (Tr. at 523-25). Claimant rated the back pain as moderate, describing it as "achy" and non-radiating, and mentioned that it waxed and waned over time. Claimant reported that the pain slightly interfered with his activities, but indicated that he was employed. He added that his back pain had worsened since the last visit. Claimant's GERD and anxiety symptoms remained the

same, and his blood pressure was controlled with medication. Claimant's physical and psychological examinations were normal. He was advised to reduce his caloric intake and follow a low cholesterol diet.

On February 8, 2012, Claimant presented to Panos Ignatiadis, M.D., at St. Mary's Neurosurgery on a referral from Dr. Beckett. (Tr. at 447-50, 454-55, 531-32). In his patient history form, Claimant recorded that his back and leg pain began in July 2011. Claimant reported symptoms of fatigue; depression; sleep issues; headaches; dizziness; heartburn; swollen feet, legs and ankles; high blood pressure and weakness; and tingling and numbness to his low back, hips and legs. Claimant stated that he had a history of chronic back pain, which was worse after his return from a vacation "down south." The pain radiated into his right leg although it did not extend down to the right foot. Claimant advised that the only prior treatment received for this complaint was a series of three steroid injections; however, they caused Claimant to gain weight, so he stopped receiving them. He weighed two hundred seventy pounds and was 5'9" in height. Claimant demonstrated intact memory and followed complex commands briskly. Dr. Ignatiadis documented that Claimant was uncomfortable when driving from Williamson to Huntington for the appointment, and while seated, he had to lean on his left hip in an effort to alleviate the pain. When examining Claimant's spine, Dr. Ignatiadis found decreased motility by fifty percent, although strength and reflexes were found to be satisfactory. Strength in both upper and lower extremities, as well as muscle tone and bulk were normal. Claimant's deep tendon reflexes measured 2+/4 throughout in both upper and lower extremities bilaterally; there was no ankle clonus seen; and the Hoffman sign was absent bilaterally. Claimant's straight-leg raise test was negative bilaterally, and he demonstrated a normal gait and arm swing. Dr. Ignatiadis reviewed

the prior MRI results, noting degenerative changes of the spine, particularly at L4-5 and L5-S1; nonetheless, he did not find any evidence of profound stenosis or disc herniation. Dr. Ignatiadis opined that conservative measures, rather than surgery, were preferable and advised Claimant to return in six weeks.

Also on February 8, 2012, Claimant saw Dr. Beckett for low back and joint pain, generally moderate in intensity, that waxed and waned over time, did not radiate, and interfered moderately with his activities. (Tr. at 527-30). Claimant described the pain as currently severe and worsening since his last visit, although he was not being treated with therapy or medication for this condition. Claimant presented with a normal mood and appropriate affect, and his physical examination was unremarkable. Dr. Beckett documented that Dr. Ignatiadis's reports were not available yet, but he had prescribed five weeks of physical therapy for Claimant to be followed by a re-evaluation.

On March 27, 2012, Dr. Ignatiadis wrote to Dr. Beckett informing him that Claimant continued to work as a coal truck driver, but had ongoing back pain that radiated into his right leg. (Tr. at 456-57). Claimant reported that Lortab did not ease his pain and he stopped physical therapy after three sessions, because it was not helping. On examination, Claimant's upper and lower extremity strength measured 5/5, and his muscle bulk and tone were normal. Claimant's deep tendon reflexes were 2+/4 throughout the upper and lower extremities. He had no ankle clonus, and the Hoffman sign was absent bilaterally. Claimant demonstrated normal gait and arm swing. His straight-leg raise test was positive at forty-five degrees. Dr. Ignatiadis continued to prescribe conservative treatment including a prescription for Mobic; assessment by Dr. Hill, a chiropractor; and injections at L4/5 by Dr. Caraway at the St. Mary's Pain Relief Center. Dr. Ignatiadis felt surgery would be a "last resort."

The following month, on April 9, 2012, Claimant returned to Dr. Beckett. (Tr. at 533-36). His chief complaints were listed as hypertension, anxiety, obesity, fatigue, and obstructive sleep apnea. Claimant's hypertension remained well controlled with medication. His anxiety symptoms, which waxed and waned in intensity, were unchanged, as was his GERD. Dr. Beckett noted that Claimant continued to be employed. His physical examination was unremarkable, and he presented with a normal mood and appropriate affect. On May 22, 2012, Claimant underwent injections by Dr. Caraway at St. Mary's Medical Center, without complication. (Tr. at 352). Claimant returned to Dr. Becket on May 25 with continued complaints of back pain. (Tr. at 537-40). Claimant's physical examination was unremarkable, and he was assessed with essential hypertension, hyperlipidemia, lumbar disc disease and obstructive sleep apnea.

On May 29, 2012, Claimant was seen by Dr. Ignatiadis, who documented his findings in a letter to Dr. Beckett. (Tr. at 415-16). According to Dr. Ignatiadis, Claimant had been through physical therapy, chiropractic treatment, and injections, with little improvement of his back pain. On May 7, Claimant called Dr. Ignatiadis, indicating that he could not work. Dr. Ignatiadis wrote Claimant an excuse-from-work slip and was now seeing him in follow-up. He described Claimant as being quite miserable, appearing stooped over, limping, and favoring his right leg. Claimant complained primarily of back and right leg pain with tingling and numbness of the entire right foot. On examination, Claimant had pain in his spine on extension. His neurologic examination revealed normal muscle bulk, tone, and strength, but he had decreased sensation in the S1 distribution, absent ankle reflex, and a positive straight-leg raise at forty-five degrees. Dr. Ignatiadis reviewed Claimant's MRI study, which showed moderate at L4/5 and

L5/S1; more specifically, a small disc protrusion with compromise of the foramen at L5/S1 on the right. Dr. Ignatiadis believed the MRI findings were consistent with Claimant's symptoms. Although spinal fusion was not advisable, Dr. Ignatiadis recommended Claimant undergo microdiskectomy.

On June 14, 2012, Claimant was admitted to St. Mary's Medical Center for microdiskectomy at L5-S1 on the right and microscopic decompression at L4-5 on the right due to a pre-operative diagnosis of herniated nucleus pulposus, and left lateral recess stenosis at L4-5 on the right. (Tr. at 339-44, 417-24). Claimant's symptoms included chronic back pain, worse since June 2011, with pain in the back radiating to the groin and down the right leg. Dr. Ignatiadis examined Claimant, documenting normal motor, sensory, cerebellar, and upper extremity reflexes; however, Claimant's lower extremities showed decreased motility of the lumbar spine. He exhibited weakness of the extensor hallucis longus, graded at 4/5, as well as decreased sensation of L4/5 distribution. Claimant tolerated the procedure well.

Claimant returned to Dr. Ignatiadis on August 7, 2012 for post-operative evaluation. (Tr. at 425-26). Claimant told Dr. Ignatiadis he was satisfied with the results. His physical examination revealed 5/5 strength in the upper and lower extremities, with normal muscle tone and bulk. Claimant's sensation was intact to joint position and pinprick throughout; his deep tendon reflexes were 2+/4 throughout the upper and lower extremities; there was no ankle clonus; and the Hoffman sign was absent bilaterally. Claimant's straight-leg raise test was negative bilaterally and his gait and arm swing were normal. Dr. Ignatiadis opined that Claimant was "doing quite well" noting that Claimant was not taking any medication. Claimant was cleared to return to work without restrictions. He was given a series of exercises to perform at home as well as

advice on activities he should avoid.

Dr. Beckett examined Claimant on September 25, 2012, documenting that he remained employed, although his back pain caused his activity level to be moderately impaired. (Tr. at 548-51). Claimant reported that he returned to work on August 13 after having back surgery, but began having back pain again, which was becoming progressively worse with time. Claimant's physical examination was unremarkable, and his mood and affect were normal. Dr. Beckett ordered an MRI of the lumbar and cervical spine and administered a Kenalog injection.

The following month, on October 6, 2012, Claimant underwent an MRI of the cervical spine at Thomas Memorial Hospital. (Tr. at 462-63). The MRI showed preserved vertebral body heights, normal alignment, and no compression deformities. Claimant had disk disease at C5-6, C6-7 and C7-T1; however, the craniocervical junction was intact and the cervical cord revealed normal signal and thickness. Disk desiccation, marginal spur formation; and a bulging annulus at C5-6 were evident. At C6-7, Claimant had a broad-based bulging annulus, disk desiccation, spur formation, and foraminal narrowing, worse on the left, as well as slight AP canal narrowing. At the C7-T1 level, there appeared broad-sided bulging annulus and foraminal narrowing that was worse on the right side., but no evidence of any discrete focal disk herniation. The following week, on October 13, Claimant returned for an MRI of the lumbar spine. (Tr. at 329-30). The MRI showed interval performance of right laminectomy with possible minimal partial resection of a right paracentral and right foraminal focal disk protrusion at L5-S1 as well as persistent moderate right neural foraminal narrowing at L5-S1. In addition, there was multi-level degenerative disc disease, facet hypertrophy, neural foraminal narrowing, and Schmorl's node formation similar to findings from a prior MRI.

On October 25, 2012, Claimant went to the emergency room at St. Mary's Medical Center complaining of low back pain, radiating to the right gluteus and right lower extremity. The pain worsened with walking or bending over and was relieved by standing still. (Tr. at 331-35). Claimant denied having bladder or bowel dysfunction, sensory or motor loss, and claimed to have experienced similar symptoms on many occasions. Gary Johnson, Physician's Assistant ("PA"), examined Claimant and found muscle spasm of the back with soft tissue tenderness, moderately limited range of motion of the lumbar spine, and decreased flexion. Claimant did not have any cranial nerve or motor deficits, weakness, or sensory deficits. His straight-leg raise test was positive on the right at forty-five degrees. However, Claimant's reflexes were normal, and he walked with a normal gait. PA Johnson assessed Claimant with "acute on chronic" lumbar radiculopathy. He provided Claimant with prescriptions for Lortab, Flexeril, and Prednisone and instructed him to follow up with his family physician and neurosurgeon.

Claimant returned to Dr. Ignatiadis on November 20, 2012, reporting that he was injured at work on October 10 causing back pain, bilateral leg pain-right greater than left, neck and right arm pain. (Tr. at 430-31). After his June surgery, Claimant went back to work and was operating a rock truck at the time of his recent injury. He went to the emergency room and was given pain medication. Dr. Ignatiadis noted his surprise at seeing Claimant walking in a stooped-over position with a pelvic tilt to the right. On examination, Claimant was oriented, followed complex commands briskly, and demonstrated intact memory. Claimant was not able to straighten his back; however, motor strength in the upper and lower extremities measured 5/5 and the muscle bulk and tone were normal. Deep tendon reflexes measured 2+/4 throughout the upper and lower extremities with the exception of the ankle reflex which was absent on the right.

Claimant had no ankle clonus, and the Hoffman's sign was absent bilaterally. He demonstrated a normal cadence of gait and arm swing. Claimant's straight-leg raise testing was positive on the right at ten degrees and positive at thirty degrees on the left. Dr. Ignatiadis diagnosed Claimant with cervical disc degeneration and a herniated lumbar disc. Dr. Ignatiadis provided Clamant with a prescription for pain medication and instructed him to begin physical therapy. Dr. Ignatiadis told Claimant to return for follow-up in six weeks, noting Claimant was unable to return to work at that time and that he was not optimistic that Claimant would ultimately be able to return to his job as a rock truck driver, as this work appeared to be exacerbating Claimant's back pain. (Tr. at 478-80)

Claimant returned to Dr. Beckett on November 28, 2012. (Tr. at 552-54). Claimant complained of tingling, numbness, loss of balance, muscle weakness, muscle and back pain. Claimant denied anxiety or depression. Claimant demonstrated a normal mood and appropriate affect. Dr. Beckett assessed him with essential hypertension, hyperlipidemia, lumbar disc disease, and obstructive sleep apnea.

On December 26, 2012, Claimant presented to a chiropractor, Cliff Hill, D.C. (Tr. at 377-79). Dr. Hill's notes reference a prior examination and treatment of Claimant on November 26, 2012 and since that visit, Claimant reported an improvement with walking; however, he still had pain with sitting, driving, or lying in bed. Claimant also complained of occasional numbness in his right leg when seated. Dr. Hill recorded that Claimant was "visibly much better" since his last visit. Claimant continued treatment with Dr. Hill for eleven additional visits:  December 28, December 31, January 2, 2013, January 4, January 7, January 9, January 11, January 14, January 16, January 18 and January 21. (Tr. at 355-76). Although Claimant continued to improve on December 28

and his prognosis was deemed fair, Claimant did not notice a decrease in his pain level. By December 31, Claimant complained of increased pain and his prognosis fell to poor and guarded. In early January, Claimant reported he was walking better, but his pain level was no better and he sometimes experienced numbness and tingling in his legs. At his January 11 visit, Claimant reported he had stooped down in his garage for two to three hours and was now having tightness and pain in his back to the point where he was not able to "get around." By January 18, Claimant reported he felt as if "10,000" needles were stabbing his feet. Dr. Hill ordered an MRI. By January 21, Dr. Hill had attempted on four occasions to start Claimant on a strengthening program; however, Claimant said he could not "do anything" as far as rehabilitation due to pain. Throughout most of his chiropractic treatment, Claimant maintained a poor prognosis. On January 21, Dr. Hill opined that the treatment did not appear to be effective in changing Claimant's condition.

On January 24, 2013, Claimant underwent an MRI of the lumbar spine at Thomas Memorial Hospital. (Tr. at 353-54). The MRI revealed post-operative changes without abnormal enhancement, no evidence of recurrent disk herniation, and no acute bony abnormality. Underlying degenerative and chronic changes were visible, but there were no new findings.

Claimant returned to Dr. Beckett on January 28, 2013. His physical examination was unremarkable, and he denied anxiety or depression. (Tr. at 557-59). Claimant remained employed. Dr. Beckett ordered laboratory work, advised Claimant to reduce his caloric intake, and instructed him to follow a low fat cholesterol diet.

Claimant saw Dr. Ignatiadis on February 5, 2013. (Tr. at 434-35). Claimant reported he was much better, and despite having some ongoing pain, wanted to return

to work. Dr. Ignatiadis agreed to authorize Claimant to return to work on the condition that he continue to take the prescribed pain medication, noting that Claimant used the medication sparingly. On examination of the spine, Claimant had full cervical and lumbar range of motion, without paraspinal muscle spasm, point tenderness, or bony step-offs. Muscle strength of Claimant's upper and lower extremities measured 5/5 and muscle tone and bulk were normal. Claimant's deep tendon reflexes were 2+/4 throughout the upper and lower extremities, except for decreased ankle reflex. However, Claimant had no ankle clonus, and the Hoffman sign was absent bilaterally. He walked with a normal gait and arm swing. His straight-leg raise test was negative bilaterally, and the Spurling sign was also negative bilaterally. Dr. Ignatiadis diagnosed Claimant with disc herniation at L5-S1 on the right side. Treatment for this condition consisted of 7.5 milligrams of Norco twice a day.

One month later, on March 5, 2013, Claimant returned to Dr. Ignatiadis walking with a stooped posture and a limp due to back and leg pain. (Tr. at 486-88). Claimant continued to work as a coal truck driver. Dr. Ignatiadis performed an examination and the results were unchanged from the prior visit. As Claimant had undergone surgery, physical therapy, and injections, none of which improved his condition, Dr. Ignatiadis advised Claimant to stop working and requested authorization to schedule Claimant to see Dr. Deer for an epidural block at L5-S1. Dr. Ignatiadis noted that Claimant's recent MRI taken post-operatively showed no evidence of residual or recurrent disc.

Claimant returned to Dr. Beckett on March 7 and April 11, 2013 with complaints of back pain radiating into the posterior right leg. (Tr. at 560-63, 490-93). Dr. Beckett noted at both visits that Claimant continued to be employed. At each visit, Claimant received a Kenalog injection and Toradol.

On April 12, 2013, Claimant presented to Richard Bowman, M.D., on a referral from Dr. Ignatiadis. (Tr. at 401-06). Claimant described having constant back pain that burned, throbbed, and ached. Sometimes the pain was dull, and at other times, it was sharp, cramping, and shooting. Medication relieved the pain, as did lying down. However, sitting, walking, standing, and exercising exacerbated the pain. Claimant stated that his legs gave out at times, causing him to fall three times in the last few months. He received no pain relief from a TENS unit, physical therapy, heat, ice, traction, or a back brace. On examination, Claimant walked independently and could make transfers without assistance. He had no cervical or thoracic pain with palpation or range of motion, but had lumbar pain along L4 through S1 level, as well as axial pain. This pain was not as significant as the pain located in his lower extremity, however, which worsened with standing and walking. Claimant did not have any atrophy of the legs, and his reflexes of the bilateral patella and Achilles tendons were one and equal. Dr. Bowman reviewed Claimant's medical imaging and saw no significant epidural fibrosis, no recurrent herniation, and no pressure at the L5-S1 level. There was neural foraminal narrowing at L4-5 that could be causing lateral recess symptomatology due to stenosis. Dr. Bowman concluded, nonetheless, that Claimant's surgery at L5-S1 had been successful, indicating that post-operative films looked "good." To treat his bilateral symptoms at L5, Dr. Bowman recommended transforaminal epidural steroid injections.

Dr. Ignatiadis saw Claimant on May 7, 2013. (Tr. at 436-38). He observed Claimant walking with a limp favoring his right leg. Claimant complained of ongoing back and leg pain, most specifically the right leg. Dr. Ignatiadis recorded that Claimant was in distress, and he had trouble rising from the examining table from a supine position. On examination, Claimant had a full range of motion of the cervical and lumbar

spine with no paraspinal muscle spasm, point tenderness, or bony step-offs. Muscle strength was 5/5 in the upper and lower extremities, and his muscle tone and bulk were normal. The reflexes in Claimant's lower extremities were preserved, and there was no ankle clonus or Hoffman's sign. His gait showed normal cadence and arm swing. Claimant's straight-leg raise test was positive at ten degrees on the right and negative on the left, and the Spurling sign was negative on both sides. Dr. Ignatiadis diagnosed Claimant with disc herniation L5 on the right. He felt that Claimant had chronic radiculopathy due to a disc herniation that was "rather incapacitating," but noted that Claimant was scheduled for pain management services.

Claimant returned to Dr. Bowman on May 8, 2013. (Tr. at 398-400). Claimant was working fulltime, but continued to struggle with low back pain. Claimant reported receiving no pain relief from a variety of treatment modalities, including physical therapy, exercise, a TENS unit, and back brace. He did have moderate relief with ice and medications. Claimant received corticosteroid injection to the lumbar joint.

Claimant saw Dr. Beckett on May 15, 2013 reporting that his back pain was gradually worsening, radiating into the posterior right leg and of an "aching" quality. (Tr. at 494-97). Claimant stated that the pain caused a moderate effect on his level of activities. Claimant presented with a normal mood and affect, denied anxiety and depression, but did report muscle pain, muscular weakness, back pain, tingling and numbness. His physical examination was unremarkable. Claimant received a Kenalog injection and Toradol.

On May 22 and June 5, 2013, Claimant returned to Dr. Bowman for a corticosteroid injection into the lumbar joint due to lumbar radiculopathy. (Tr. at 395-97, 392-94). Claimant tolerated the procedures well.  On June 18, 2013, Claimant was

examined by Dr. Bowman in follow-up to the injections. (Tr. at 387-91). Claimant reported that he received "75%" relief with the first injection lasting four days, "0%" relief with the second injection and "50%" relief with the third injection that lasted two to three days. However, Claimant reported that his low back pain was now constant, burning, and throbbing. The pain was worse when he stood, walked, or sat down, and was somewhat relieved when laying down on either side. Claimant indicated that neither his pain medication, Lortab, nor Neurontin alleviated the pain. Claimant complained that his "legs and back went out" that morning, and he was walking with the aid of a cane. According to Claimant, he used a TENS unit, but it provided no relief; nor had exercise, physical therapy, heat, medication, epidural injections, or a back brace. Despite these symptoms, Dr. Beckett documented that Claimant was working a fulltime job. A systems review found that, with the exception of sleep disturbances, all systems were within normal limits. On examination, Claimant walked independently with the use of a cane, but with antalgia to the left. Claimant had no thoracic pain with palpation or range of motion; however, he reported severe tenderness of the L3 through S1 paraspinal musculature and bilateral buttocks. He had pain with flexion, extension, and rotation, and the pain radiated down the bilateral L5 dermatomes with lumbar flexion greater than fifty degrees. Full lumbar extension caused his back and buttock pain to increase. Dr. Bowman felt that Claimant had myofascial pain of the low back and chronic lumbar radiculopathy with axial and radicular symptoms. He thought Claimant would be a good candidate for a neurosurgical evaluation, noting that if surgery due to epidural fibrosis was not a feasible option, he would recommend a spinal cord stimulator. However, Claimant was not interested in the spinal cord stimulator at that time.

Claimant returned to Dr. Ignatiadis on July 9, 2013. Claimant walked with a

stooped posture and with the use of a cane, favoring his right leg; nevertheless, Dr. Ignatiadis noted Claimant's leg muscles appeared "quite satisfactory," except for possible weakness of the dorsiflexors of the right foot. (Tr. at 441-43). Dr. Ignatiadis believed that Claimant's symptoms stemmed from disc herniation at L4/5, for which he had undergone a microdiskectomy that was not successfully relieving his symptoms. Dr. Ignatiadis suspected that Claimant had developed scar tissue and recommended that he undergo an MRI to determine the status.

On July 22, 2013, Claimant went to Thomas Memorial Hospital for an MRI of the lumbar spine due to low back pain, weakness of the legs, numbness and tingling of the lower extremities, history of falling, and history of lumbar surgery. (Tr. at 445-46). The MRI revealed a mild disc bulge at L1-2; no significant disc bulge at L2-3; mild to moderate diffuse disc bulge at L3-4, with minimal neural foraminal narrowing; moderate diffuse disc bulge at L4-5, with bilateral facet hypertrophy and bilateral neural foraminal narrowing, worse on the right; and moderate diffuse disc bulge at L5-S1 with evidence of a right-sided laminectomy defect and associated scarring, mild facet hypertrophy, more prominent on the right, and neural foraminal narrowing more prominent on the right. Overall, Claimant's MRI was interpreted as showing degenerative and postsurgical changes with areas of neural foraminal narrowing.

Claimant returned to Dr. Beckett on July 29, 2013 for follow-up to low back pain although at this visit, he did not have any current complaints and was "doing well." (Tr. at 498-501). Dr. Beckett recorded that Claimant's level of activity was reportedly moderately affected by back pain; however, he remained employed and treated his back pain with medication. The record also indicated that Claimant complied with his medication but continued to have trouble adhering to the recommended diet and

exercise. Claimant presented with a normal mood, appropriate affect, and denied symptoms of depression or anxiety. His physical examination was unremarkable. Claimant was assessed with essential hypertension, hyperlipidemia, lumbar disc disease, and obstructive sleep apnea.

Claimant saw Dr. Beckett twice more in 2013: September 6 and October 11. (Tr. at 590-97). On September 6, Claimant described his low back pain as aching, radiating into his posterior right leg, and worsening. Claimant also reported that his anxiety disorder was essentially unchanged, waxing and waning in severity. His physical examination was unremarkable. By October 11, Claimant reported pain in his back and neck, rating the back pain at seven on the ten-point pain scale, and describing the back pain as "aching," "worsening," and radiating into the posterior right leg. Claimant's conditions of hypertension, hypothyroidism, and hyperlipidemia remained reasonably well controlled on medication. Claimant's anxiety remained unchanged, waxing and waning at times; still, as of this visit, Dr. Beckett documented that Claimant remained employed. Once again, his physical examination was unremarkable. Dr. Beckett recorded that Claimant denied having visual disturbances, reduced vision, or hearing loss at all of his appointments in 2013. (Tr. at 491, 495, 499, 558, 591, 595).

Claimant returned to Dr. Beckett in 2014 on eight occasions: February 19, April 7, April 29, August 11, October 6, October 27, November 24, and December 8. (Tr. at 579, 598-04, 608-29). On February 19, Claimant complained of sinus congestion, facial pain, headache and nasal discharge. (Tr. at 598-600). Dr. Beckett assessed him with acute maxillary sinusitis. On April 4 and April 29, Claimant complained of back and neck pain. The back pain was described as "aching" and "burning," waxing and waning over time, and radiating into the posterior right leg. Physical examinations were

unremarkable other than light touch sensation was reduced in Claimant's feet. Claimant was noted as being employed. (Tr. at 601-04, 608-10).

On August 11, Claimant told Dr. Beckett he was "doing well," and had no current complaints; however, Claimant rated his back pain as nine out of ten and reported his activity level continued to be moderately impaired due to back pain. (Tr. at 611-14). Claimant's physical examination findings mirrored those of his April visits and his mood remained normal with appropriate affect. On October 6, Claimant told Robin Sanger, Nurse Practitioner, that six days earlier, he had developed pain in the lumbar region that was moderate in severity and radiated into his legs. (Tr. at 615-17). Claimant stated that the increase in back pain was gradual, and he believed it was precipitated by his return to work. Claimant indicated that the pain was exacerbated by bending, lifting, and prolonged standing, and it interrupted his sleep. However, Claimant denied limitation of motion. An examination of the spine revealed moderate tenderness to palpation of the lumbar region, but no evidence of subluxation; the spine demonstrated normal range of motion; and the paracervical and neck muscle strength were found to be within normal limits. Claimant's right lower extremity was tender to palpation in the gluteal region, but his joints were stable and range of motion was within normal limits. Claimant had no edema, ecchymosis, joint or limb tenderness, joint instability, decreased range of motion, joint crepitus, or pain in the left lower extremity. His motor strength and tone were normal in the both lower extremities, and no abnormal movements were noted. Reflexes of Claimant's bilateral knees and ankles measured 2, and the Babinski response was negative. Claimant demonstrated a normal mood and appropriate affect, with intact judgment and insight. Nurse Sanger assessed Claimant with backache and lumbar disc disease. He received a Kenalog injection and Toradol.

Nurse Sanger advised Claimant to avoid heavy lifting.

On October 27, Claimant returned to Dr. Beckett with continued complaints of severe back and neck pain that radiated into his posterior right leg. (Tr. at 618-21). Claimant continued to remain employed; however, his level of activity was moderately affected by his back pain. Claimant's conditions of hypertension, hyperlipidemia, and hypothyroidism were well controlled with medication. Claimant reported that his anxiety was unchanged from his last visit and that it tended to wax and wane in severity. Dr. Beckett noted that Claimant had gone to the emergency room on October 23, complaining of chronic back pain, where he received injections and prescriptions for Robaxin and Medro Pack. (Tr. at 585-89). Claimant's physical examination was unremarkable, other than reduced sensation with light touch of the feet.

On November 24 and December 8, Claimant's physical examination was unchanged. (Tr. at 579, 622-29). At the November 24 visit, Dr. Beckett recorded that Claimant continued to be employed; however, by December 8, Claimant told Dr. Beckett he attempted to work but due to "excruciating" pain, he was not able to continue. Therefore, Dr. Beckett advised Claimant to stop working and provided him with a medical excuse to be off work indefinitely. (Tr. at 579). In addition to back pain, Claimant complained of numbness and tingling of the limbs. Dr. Beckett ordered laboratory work, and prescribed Toradol for pain relief. Neither Dr. Beckett nor Nurse Sanger documented any visual disturbance, reduced vision, hearing loss, or extremity edema during Claimant's examinations in 2014. (Tr. at 599-600, 602, 603, 609, 612, 613, 616, 620, 623, 624, 627, 628).

In 2015, Claimant returned to Dr. Beckett's office four times: April 6, July 20, August 10 and August 13. (Tr. at 632-35, 639-46, 648). On April 6, Claimant complained

of continued pain in the right lower extremity that was now occurring in the left lower extremity as well, rating his pain as six out of ten. Claimant reported limited mobility and stated that if he engaged in activity, he had to take pain medication. Claimant also reported mild depression. Dr. Beckett assessed Claimant with essential hypertension, hyperlipidemia, GERD, hypothyroidism, low back pain, lumbar disc disease, neuralgia, radiculitis, and obstructive sleep apnea. On July 20 and August 10, Claimant's physical examination and his medical issues were the same. On August 13, Claimant received an injection of Toradol for pain control. Throughout Claimant's examinations by Dr. Beckett in 2015, Claimant denied vision loss and hearing loss, and upon examination, he had no extremity edema. (Tr. at 633-34, 640-41, 644-45).

### B.  Evaluation and Opinion Evidence

On May 15, 2013, Dominic Gaziano, M.D., completed a Physical Residual Functional Capacity Assessment. (Tr. at 94-95). Dr. Gaziano found that Claimant could occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; and had unlimited ability to push and/or pull, other than the limitations placed on lifting and/or carrying. Claimant could frequently climb ramps, stairs, ladders, ropes or scaffolds, as well as balance, stoop, kneel, crouch or crawl. Claimant did not have any manipulative, visual, communicative, or environmental limitations. Dr. Gaziano noted that Claimant had been assessed by his neurosurgeon two months post-operatively, and the examination revealed normal findings with no radiculopathy. Claimant demonstrated a normal gait and the physician authorized Claimant to return to work full time. On September 5, 2013, Rabah Boukhemis, M.D., completed a Physical Residual Functional Capacity Assessment wherein he found no new significant evidence

that would alter Dr. Gaziano's assessment. (Tr. at 106-08).

On May 29, 2013, Kelly Robinson, M.A., performed a psychological evaluation, consisting of a client interview and mental status examination. (Tr. at 380-84). Claimant drove himself to the appointment and appeared casually dressed, although his grooming and hygiene were poor. Claimant walked with a right leg limp and slouched posture. His speech was normal, and he had no obvious visual or hearing impairments. Claimant complained of depression, lack of interest, sleep issues, lack of energy, negative thoughts, feelings of worthlessness and hopelessness, as well as problems concentrating. Claimant attributed the onset of his symptoms to his father's death in February 2009. He was currently taking Cymbalta prescribed by his family physician, but had never received treatment from a mental health provider. As far as his educational history, Claimant reported quitting school in the twelfth grade; however, he earned a GED in 2002. While in school, he was placed in regular classes, received average to below average grades, got along well with others, and had no disciplinary problems. Vocationally, Claimant was unemployed, but last worked as a coal miner. He had also driven a coal truck and worked in a factory. Claimant reported being fired from his truck driver job, because he "had an interview with another company" and his employer found out.

Ms. Robinson performed a mental status examination, describing Claimant as alert and oriented. His mood was dysphoric, and his affect was mildly restricted. Claimant demonstrated logical and coherent though processes with no sign of delusion, obsessive thoughts, or compulsive behavior. He did not report any unusual perceptual experiences. Claimant's insight was fair; however, his judgment was found mildly deficient. His immediate, recent, and remote memory was within normal limits, as was

his ability to concentrate. Claimant exhibited pain with restlessness and continual movement. He described his daily activities as arising at seven a.m. He would then "just either sit for a bit, lay around, lay on my sides mostly, … to get relief from pain," and "might go out on the porch or out in the yard and sit around for a few minutes." He also watched television, talked with his wife, took his medications, and showered with assistance. Weekly activities included visiting his great nieces when they came to his home and attending church; although after sitting in church, his pain level made him feel "in misery." Once a month, Claimant visited his mother for one hour, but noted he was "not able to do anything right now." Ms. Robinson assessed Claimant with major depressive disorder, recurrent-moderate, and anxiety disorder, not otherwise specified. His prognosis was fair. Claimant's social functioning, concentration, persistence, and pace were within normal limits, and he was deemed capable of managing any benefits he might receive.

On June 3, 2013, Karl G. Hursey, Ph.D., completed a Psychiatric Review Technique under Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders). (Tr. at 92-94). Dr. Hursey found Claimant had no restrictions of activities of daily living, maintaining social function, or maintaining concentration, persistence or pace. Claimant had no episodes of decompensation, nor did the evidence establish the presence of the paragraph "C" criteria. Dr. Hursey opined that Claimant did not meet the diagnostic criteria of an anxiety-related disorder. Although he believed Claimant demonstrated problems due to physical issues as opposed to mental issues, Dr. Hursey found Claimant's social functioning, concentration, persistence, and pace to be within normal limits. Dr. Hursey stated that Claimant was capable of being independent with household finances and, overall, Claimant's mental impairments were non-severe. On

September 5, 2013, John Todd, Ph.D., completed a Psychiatric Review Technique form based on his review of the records and affirmed Dr. Hursey's findings as written. (Tr. at 105-06).

On July 9, 2013, Dr. Ignatiadis completed a Medical Assessment of Ability to do Work-Related Activities (Physical) form. (Tr. at 410-13). Although Dr. Ignatiadis found Claimant restricted in his ability to lift and/or carry, Dr. Ignatiadis did not specify the extent of the restriction by providing weight or time limits. He also opined that Claimant could stand and/or walk for a total of one hour and sit a total of four hours in an eight-hour workday, but failed to supply any medical findings or explanation in support of these limitations. Dr. Ignatiadis indicated that Claimant could never climb, balance, stoop, crouch, kneel, or crawl, and he was impaired to an unspecified degree in reaching, handling, feeling, seeing, hearing, and speaking. However, Dr. Ignatiadis felt Claimant had unlimited ability to push and pull and had no environmental limitations. Despite clear instructions on the form, which explained the importance of including specific medical findings to corroborate the RFC assessment, Dr. Ignatiadis made no effort to explain or bolster his opinions.

On August 20, 2013, David Lawson, M.A., performed a psychological evaluation at the request of Claimant's counsel. (Tr. at 565-72). Claimant told Mr. Lawson that his mental health symptoms began with the onset of his health issues. According to Claimant, he had surgery for herniated discs in his back and returned to work eight weeks later. Scar tissue developed around the surgery sites, and he was now in constant pain. Claimant listed his psychological symptoms to include anxiety, depression, nervousness, excessive worry, irritability, being easily upset, episodes of crying, restlessness, isolation, problems concentrating, lack of interest, being bothered by noise,

having trouble making decisions, and sleep disturbance. He received Cymbalta from his family doctor but did not participate in any other psychiatric treatment. As for hobbies and interests, Claimant stated that he occasionally watched television, but was unable to do any of his prior hobbies; such as, four-wheeling, boating, and yardwork. Upon examination, Claimant appeared poorly groomed, used a cane for ambulation, changed positions frequently, and seemed to sweat profusely. Claimant presented a dysphoric mood and congruent affect. Claimant's insight was fair although his judgment was severely deficient. Claimant's immediate memory was within normal limits; however, his recent memory was severely deficient and his remote memory mildly impaired. Claimant showed a deficient general fund of information and his concentration was moderately deficient, although his pace was within normal limits. Mr. Lawson administered the Wechsler Adult Intelligence Scale-Fourth Addition; however, Claimant was unable to complete the test due to pain. On the Wide Range Achievement Test-Fourth Edition, Claimant scored 81 in word reading, 71 in sentence comprehension, 88 in spelling and math computation, and 74 in reading composite. Mr. Lawson opined that due to Claimant's behavioral and automatic symptoms of a moderate to high level of pain, the scores did not accurately represent his current level of achievement ability. Mr. Lawson also administered the Minnesota Multiphasic Personality Inventory-Second Addition, but again, Claimant reported that pain prevented him from completing an adequate number of items to acquire a valid measurement. Mr. Lawson administered the Miller Forensic Assessment of Symptoms to assess whether Claimant was malingering, and determined that the test results corroborated Claimant's veracity. Claimant also scored in the severe range of depression on the Beck Depression Inventory, Second Addition, and the moderate to severe range of anxiety on the Beck

Anxiety Inventory. Mr. Lawson assessed Claimant with mood and anxiety disorders related to his chronic pain. He felt that Claimant had a poor prognosis and needed more intensive mental health treatment and monitoring for suicidal ideation. Mr. Lawson added that he was not able to obtain valid measurements of Claimant's current level of intellectual functioning, academic achievement, and measure of personality. However, he did not believe that Claimant was a good candidate for vocational rehabilitation and concluded that Claimant would be "unable to sustain steady, gainful employment of even the light or sedentary type."

On September 19, 2013, Mr. Lawson completed a Medical Assessment of Ability to do Work-Related Activities (Mental) form. (Tr. at 573-74). Mr. Lawson found Claimant to have a poor ability to follow work rules; interact with supervisors or maintain attention and/or concentration; and had no useful ability to relate to co-workers, deal with the public, use judgment, deal with work stress, or function independently. Claimant had a poor ability to understand, remember, and carry out detailed, but not complex job instructions; understand, remember and carry out simple job instructions; and he had no useful ability to understand, remember, and carry out complex job instructions. As for making personal-social adjustments, Mr. Lawson opined that Claimant had no useful ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability. Mr. Lawson did find Claimant capable of managing any benefits he might receive.

On April 30, 2014, Dr. Beckett completed a Medical Assessment of Ability to do Work-Related Activities (Physical) form. (Tr. at 575-78). Dr. Beckett opined that due to herniated disc disease and chronic back pain, Claimant could only lift and/or carry a

"very little" one third of an eight-hour day. He could stand or walk only one-third of an hour in an eight-hour workday due to numbness and tingling in the limbs and history of falling. Claimant could sit only one third of an hour in an eight-hour workday due to pain and edema. Claimant could occasionally balance, but never climb, stoop, crouch, kneel, or crawl. Due to the bulging disc in Claimant's neck and back and the numbness and tingling in his limbs, as well as Claimant's partial deafness, his physical functions of reaching, feeling, pushing, pulling, and hearing were affected; however, he had no issue with handling, seeing, or speaking. Claimant had no environmental restrictions. On December 8, 2014, Dr. Beckett wrote a note on a prescription pad stating that Claimant was "unable to work" until further notice. (Tr. at 579).

### C. Claimant's Statements

In an Adult Disability Report prepared by Claimant in March 2013, he stated that he had stopped working on March 5, 2013, because of his physical and psychological conditions. (Tr. at 224). Prior to leaving his job as a rock truck driver at a surface mine, Claimant worked eleven hours per day, five days per week. (Tr. at 225). Claimant's job duties involved driving a 200-ton rock truck, hauling rock and dirt. (Tr. at 234). His work required him to sit and crouch 11 hours per day. In a pain questionnaire filed the same day, Claimant described having lower back and leg pain that burned, ached, and throbbed. (Tr. at 241). He indicated that he was never pain free; his pain increased with bending, lifting, squatting, sitting, and walking, and was relieved by lying down on his side. (*Id.*). In an accompanying Adult Function Report, Claimant stated that the pain affected his ability to sit in the truck, get in and out of the truck, and ride. (Tr. at 246). Claimant described his daily activities as lying on the couch, watching television, and walking out to the porch. (Tr. at 247). He had no problem feeding himself, shaving, or

using the bathroom, but he needed a shower chair for bathing. Claimant was able to stand to make himself a sandwich, but could not stand any longer than five minutes. (Tr. at 248). Claimant could drive and ride in a car, but could not do any household chores, such as cutting the yard. (Tr. at 249). Claimant did not participate in hobbies or social activities, but did attend church once per week. (Tr. at 250). He could walk 75 feet before resting, could pay attention for fifteen minutes, and used a cane to keep from falling. (Tr. at 251-52).

In July 2013, Claimant filed another Adult Function Report that was consistent with the report filed in March, except Claimant could now walk only 50 feet before needing to rest. (Tr. at 268). He stated that he continued to use a cane, which was prescribed for him in May 2013. (Tr. at 269). In a pain questionnaire, Claimant reiterated that he was never pain free. (Tr. at 271). He indicated that he took Lortab and Neurontin for his back and leg pain, which never relieved his pain and caused him to feel drowsy. (Tr. at 273).

At the administrative hearing in April 2015, Claimant testified that he finally quit working altogether in December 2014 when his family physician, Dr. Beckett, told him that his job was destroying his back, and he would end up in a wheelchair. (Tr. at 42). Claimant stated that he had constant pain in his back, shoulders, neck, and legs. (Tr. at 51). His legs and hips were weak and would become numb, causing him to fall. Claimant also complained of numbness in his right hand related to a long-standing carpal tunnel disorder, which limited his ability to grasp and hold objects. (Tr. at 51-52, 62). According to Claimant, he could no longer do any chores around the house, and he spent his days lying on the couch. (Tr. at 56). Claimant testified that he also had trouble remembering things and was depressed. (Tr. at 57-58). When he moved too quickly, he had dizzy

spells. (Tr. at 61-62). Claimant stated that he had become dependent on his wife to do the chores and help him bathe and dress. (Tr. at 66-67).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    Discussion

Claimant does not dispute, and the record establishes, that Claimant was engaged in substantial gainful activity ("SGA") from the alleged onset date of May 7, 2012 through March 2013 and again from May 27, 2014 through December 8, 2014. (Tr. at 14-15, 42-43, 45, 224, 233). The record also shows that during these periods of employment,

Claimant performed medium to heavy exertional work, completing ten to twelve-hour shifts, totaling 55 to 72 hours of work per week.[1] (Tr. at 44, 72, 234-35).

In order to qualify for DIB, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expect to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423. In considering the duration requirement, "it is the inability to in engage in SGA because of the impairment that must last the required 12-month period." SSR 82-52, 1982 WL 31376, at *1 (S.S.A. 1982); *see, also, Barnhart v. Walton,* 535 U.S. 212, 217-19 (2002) (accepting SSA's position "that a claimant is not disabled 'regardless of [his] medical condition,' if he is doing 'substantial gainful activity.'"). Thus, as the Commissioner contends, Claimant has not demonstrated that he was under a disability during the above-stated periods. 20 C.F.R. § 404.1520(b). Consequently, the undersigned will considered Claimant's challenges only as they apply to the period between April 2013 and April 2014, and the period after December 2014.

## A. *The ALJ's Assessment of Claimant's Impairments*

Claimant contends that the ALJ did not "properly consider or make a record of"

---

[1] Claimant describes the period between May 27, 2014 and December 8, 2014 as an unsuccessful work attempt. However, that description is inconsistent with 20 C.F.R. § 404.1574, which states: "We will not consider work you performed at the substantial gainful activity earnings level for more than 6 months to be an unsuccessful work attempt regardless of why it ended or was reduced below the substantial gainful activity earnings level." *See, also,* Social Security Ruling ("SSR") 05-02, 2005 WL 568616, at *3 (S.S.A. Feb. 28, 2005) (stating that any "SGA-level work lasting more than 6 months cannot be an [unsuccessful work attempt] regardless of why it ended or was reduced to the non-SGA level."). Working from May through December 2014, Claimant earned $3763 in the second quarter of 2014; $17,150 in the third quarter of 2014; and $21,811 in the fourth quarter of 2014. (Tr. at 14-15). As his earnings were above the SGA level and his work lasted more than six months, his May through December 2014 work was not an unsuccessful work attempt; rather, it was substantial gainful activity. (*Id.*). Accordingly, Claimant was not disabled from May 2012 through March 2013, or from May 2014 through December 2014. 20 C.F.R. § 404.1520(b).

Claimant's dizzy spells, depression, anxiety, difficulty grasping and holding, sleep disturbance, mental limitations, episodes of decompensation, and pain. The undersigned **FINDS** no merit to this assignment of error. With respect to Claimant's psychological conditions, the ALJ reviewed the treatment records, Claimant's statements, and the medical source statements, and then used the special technique to assess the severity of the conditions. (Tr. at 15-16). She found that Claimant had mild limitations in activities of daily living based upon his statements that he remembered to take his medication, watched television, ate without assistance, and took care of his own grooming with the help of a shower chair. (Tr. at 16). She further determined that Claimant had mild limitations in social functioning, because while his pain symptoms limited his social contacts, he still went to church weekly, had a good relationship with his wife, visited regularly with his mother, and spent time with his grand nieces. (*Id.*). Claimant was also mildly limited in concentration, persistence, or pace, based upon his psychological testing and his ability to watch television for extended periods. (*Id.*). The ALJ noted that Claimant had no episodes of decompensation.

Claimant particularly disagrees with this latter finding, suggesting that he had episodes of decompensation when he was unable to function for several days each month as a result of back pain, depression, and the side effects of medication. Claimant supplies no citations to the record to substantiate the factual basis of his contention; however, a review of the record indicates that when Claimant had episodes of symptom exacerbation, the episodes were primarily related to his musculoskeletal disorders rather than his depression and anxiety. The phrase "episodes of decompensation," as defined in Listing 12.00 refers to an exacerbation of the signs and symptoms of a *mental disorder* that:

would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, ¶ 12.00(C)(4) (eff. Aug 12, 2015 to May 23, 2016).

Although Claimant complained of feeling depressed due to his physical limitations, he never sought counseling or formal psychiatric care. Claimant took Cymbalta and Klonopin, which were prescribed by his family physician, but never required a significant alteration in medication, was never referred for psychological counseling, and never received care in a hospital or crisis center due to psychological symptoms. To the contrary, in the majority of his medical records, Claimant was described as having a normal mood and affect. Accordingly, he does not demonstrate episodes of decompensation as defined in Listing 12.00 and as applied in the special technique.

As to his alleged dizzy spells, inability to grasp and hold objects, and sleep disorder, there simply are no treatment records to support a finding that Claimant had dizzy spells, or deficits in his fine motor skills. While his family physician included a diagnosis of "obstructive sleep apnea" in Claimant's list of conditions, no records were submitted that explained the basis of the diagnosis, or substantiated that objective medical testing was performed on Claimant in order to make the diagnosis. Moreover, Claimant's sleep apnea apparently did not require treatment, as none was ordered, and the record does not demonstrate any significant change in Claimant's symptoms over time, or verify any specific functional limitations related to a sleep disorder. Claimant alleges in his brief that "objective test results" support his testimony regarding these

conditions, yet he provides no citations to objective test results in the record. The Court is not tasked with scouring the evidence in an effort to determine what documents were contemplated by Claimant when he made that representation. Rather, to mount a viable argument that the ALJ erred by not considering particular impairments, Claimant must demonstrate to the Court that the alleged impairments were medically determinable. In other words, the impairments "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. ... [A] physical or mental impairment must be established by objective medical evidence from an acceptable medical source. .... [The SSA] will not use [a claimant's] statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s)." 20 C.F.R. § 404.1521. Claimant fails to provide objective support for these alleged impairments and fails to demonstrate that they had more than a minimal effect on his ability to do basic work activities. Consequently, the ALJ did not err by declining to address them in greater detail.

Finally, Claimant complains that the ALJ did not adequately consider or make a record of Claimant's pain. A review of the written decision demonstrates the contrary. The ALJ acknowledged Claimant's allegations of disabling pain and referred to medical records and third-party statements corroborating Claimant's longstanding difficulties with chronic back pain, numbness, and tingling. (Tr. at 18). The ALJ also discussed Claimant's reports regarding the limiting effects of his pain. (*Id.*). The ALJ found Claimant's statements to be entirely credible to the extent that he claimed his pain and other symptoms prevented him from doing his past relevant work. However, the ALJ did not find Claimant's pain to be so severe and unrelenting that he was disabled from *all* employment. The ALJ reviewed the history of Claimant's back pain, pointing out that

while Claimant had episodes of pain exacerbation, he generally improved with rest and treatment, and he maintained normal motor strength, tone, and bulk. (Tr. at 19). In addition, Claimant's treating physician, Dr. Beckett ordered nothing more than pain medication and observation. In the end, the ALJ felt that Claimant's RFC was significantly limited—to less than a full range of sedentary work—but he could still do some jobs that existed in significant numbers in the national economy. (Tr. at 17-22).

The ALJ clearly considered and made a record of Claimant's pain. Therefore, the undersigned **FINDS** that Claimant's challenge is without merit. Furthermore, the ALJ's finding regarding the functional effect of Claimant's pain is supported by substantial evidence. As she emphasized, Claimant does suffer from pain in his back and legs, as well as numbness and tingling. However, during much of the period of alleged disability, Claimant worked fulltime, performing medium to heavy exertional work for long hours each day, five or six days per week. He stopping working when his symptoms flared up, but his condition generally improved with time away from the demands of his job and with ongoing treatment. In addition, two agency experts, who reviewed Claimant's medical records, believed that he could perform medium level exertional work; one of the experts, Dr. Boukhemis, examined records prepared during a period of symptom exacerbation. Although the ALJ considered these opinions, she appropriately examined the evidence as a whole to determine whether significant changes occurred after the consultants had provided their opinions that might affect the weight of those opinions. Noting that information had accumulated after the agency experts' reviews, which demonstrated that Claimant's musculoskeletal condition had deteriorated, the ALJ rejected their opinions on exertional level, and concluded that Claimant's RFC was reduced from a medium to a sedentary exertional level. (Tr. at 20). Therefore, the ALJ

performed a thorough analysis of Claimant's pain and reflected the results of that analysis in the RFC finding.

### B.  Weight Given to Treating Physician Opinions

Claimant argues that the ALJ erred by giving little weight to the opinions of Dr. Beckett and Dr. Ignatiadis, Claimant's treating physicians. Dr. Ignatiadis provided an RFC assessment on July 9, 2013, finding Claimant limited in lifting (amount not specified); unable to stand or walk more than one hour in an eight-hour workday; unable to sit more than four hours in an eight-hour work day; with substantial postural, visual, communicative, and manipulative limitations. Dr. Ignatiadis specifically opined that Claimant's abilities to see, speak, and hear were affected by his impairments. The ALJ rejected these opinions, stating that the record did not support them. In particular, the ALJ pointed out the complete lack of evidence indicating that Claimant had trouble seeing, hearing, and speaking. The ALJ also found the opinions to be internally inconsistent, because Dr. Ignatiadis found Claimant limited in reaching, but not limited in pushing and pulling. (Tr. at 21).

Dr. Beckett opined on April 30, 2014 that Claimant could lift and carry "very little"; could stand, walk, and sit no more than "1/3" hour in an eight-hour workday; and had many postural limitations. (Tr. at 575-78). The ALJ afforded these opinions little to partial weight, because they conflicted with Dr. Beckett's July 29, 2013 treatment record. In that clinical note, Dr. Beckett described Claimant as "doing well" with "no current complaints." (Tr. at 498). In addition, the ALJ found Dr. Beckett's opinions to be vague and unreliable given that one month after his opinions were given, Claimant began working long and demanding hours as a water truck driver at a mining site. (Tr. at 20).

In December 2014, Dr. Beckett wrote a note stating that Claimant was unable to work until further notice. The ALJ gave this opinion no weight, because Dr. Beckett's treatment records reflected only observation of Claimant, with no procedures or medical imaging ordered in over a year and a half. (Tr. at 21). In addition, the ALJ explained that Dr. Beckett's opinion had to be considered in context, noting that the work from which he removed Claimant involved medium to heavy exertional work. Finally, the ALJ indicated that if Dr. Beckett intended to opine that Claimant was unable to do *any* work, this opinion was rejected for two additional reasons: first, the record did not support the opinion; and second, the issue of disability was not a medical opinion, but was an administrative decision left to the Commissioner. (*Id.*).

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2).

The regulations outline how the opinions of accepted medical sources should be weighed in determining whether a claimant qualifies for disability benefits. *Id.* § 404.1527(c). For claims filed prior to March 27, 2017 (such as Claimant's), the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* § 404.1527(c)(1)-(2). A treating physician's

41

opinion on the nature and severity of an impairment may be afforded controlling weight when the following two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. § 404.1527(c)(1)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (S.S.A. Jul. 2, 1996).[2] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at *4. On the other hand, when there is persuasive contrary evidence in the record, a treating physician's opinion may be rejected in whole or in part. *Coffman v. Bowen,* 829

---

[2] Social Security Rulings 96-2p, 96-5p, and 06-3p have been rescinded for claims filed on or after March 27, 2017; therefore, they still apply to this claim. *See* 82 FR 15263-01.

F.2d 514, 517 (4th Cir. 1987). Generally, the more consistent a physician's opinion is with the record as a whole, the greater the weight an ALJ will assign to it. *Id.* § 404.1527(c)(4); *see, also, Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 268 (4th Cir. 2017) (highlighting three factors that could determine the weight of a medical source's opinion and justify a deviation from the treating physician rule: "supportability in the form of a high-quality explanation for the opinion and a significant amount of substantiating evidence, particularly medical signs and laboratory findings; consistency between the opinion and the record as a whole; and specialization in the subject matter of the opinion."). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. 20 C.F.R. § 404.1527(d); SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3; *see, also, Brown*, 873 F.3d at 256 ("Thus, for example, when a medical source renders an opinion that a claimant is " 'disabled' or 'unable to work,' " the ALJ will consider "all of the medical findings and other evidence that support" the medical source's opinion, but will not necessarily make a favorable disability determination.") (quoting 20 C.F.R. § 404.1527(d)(1)).

Applying this framework, the undersigned examines the ALJ's reasons for deviating from the treating physician rule. In regard to Dr. Ignatiadis's July 2013 RFC assessment, the undersigned **FINDS** that the ALJ provided good reasons for the weight she gave the opinions. Dr. Ignatiadis found Claimant limited in a number of work activities, but supplied absolutely no explanation of the reasons for any of his opinions. Dr. Ignatiadis's omission was particularly noticeable, because the RFC form emphasized that the usefulness of the physician's assessment would depend upon the extent to which he offered medical findings to explain and validate his proposed limitations. In addition, Dr. Ignatiadis opined that Claimant's impairments limited his ability to see, hear, and

speak, notwithstanding the absence of evidence establishing the existence of such deficits. Indeed, the clinical records and Claimant's subjective reports refute the contention that he had any limitations in those abilities. Consequently, Dr. Ignatiadis's opinions are either unsupported or are inconsistent with the record. The ALJ further noted that Dr. Ignatiadis found limitations in Claimant's ability to reach, handle, and feel, but curiously found no limitations in his ability to push and pull. The internal inconsistences in the form, combined with the lack of any explanation for the suggested limitations, certainly undermined the probative value of Dr. Ignatiadis's RFC assessment. Lastly, Dr. Ignatiadis provided no opinion as to whether Claimant's limitations would persist for a period of twelve months. In fact, the record establishes that they did not, as Claimant returned to medium level work on a fulltime basis approximately ten months later.

With respect to Dr. Beckett's first opinion, the ALJ's reference to one clinical record written nine months before Dr. Beckett issued his RFC assessment did not provide a particularly good reason for rejecting the entire assessment; particularly, when comparing the July 2013 note referenced by the ALJ to the clinical note prepared by Dr. Beckett the day before he issued the RFC assessment. On April 29, 2014, Dr. Beckett recorded that Claimant was complaining of waxing and waning back and neck pain that was severe—meriting an eight on a ten-point pain scale. Claimant also reported that the pain was chronic, worsening, and moderately affected his level of activities. Therefore, at the time the RFC assessment was written, Claimant's condition had deteriorated and he was no longer "doing well." The ALJ failed to acknowledge the deterioration or explain why the July 2013 note was more persuasive than the April 2014 note.

However, the undersigned **FINDS** that the two other reasons given by the ALJ for rejecting the RFC assessment provide sufficient justification for that determination and comply with the treating physician rule. First, the ALJ found Dr. Beckett's opinion to be vague, with little probative value. In other words, Dr. Beckett failed to provide a "high-quality explanation" for his opinions. *Brown,* 873 F.3d at 268. Other than generically referring to Claimant's diagnoses and tests, Dr. Beckett supplied few details about Claimant's condition, and no objective medical findings, to explain why Claimant was so extremely limited in his ability to stand, sit, walk, lift, and carry. Second, the ALJ pointed out that Claimant was working at a far greater exertional level than described by Dr. Beckett and continued to work at that level for more than six months, often clocking in excess of 60 hours per week. Clearly, Claimant's highly demanding work schedule, which began less than one month after Dr. Beckett's radical RFC assessment, completely undermined the supportability and reliability of his opinions.

Looking next at Dr. Beckett's December 2014 statement that Claimant was unable to work until further notice, (Tr. at 579), the undersigned **FINDS** that the ALJ provided good reasons for the weight given to the statement. The ALJ noted that the statement was ambiguous, adding that if Dr. Beckett meant to prohibit Claimant from further work as a water truck driver, then the ALJ agreed that the record supported such an opinion. However, if Dr. Beckett intended to pronounce Claimant disabled from *all work,* such an opinion was not supported by or consistent with Dr. Beckett's own clinical records. The ALJ explained that Dr. Beckett's treatment of Claimant from July 2013 through January 2015 consisted only of observation and pain medications. Dr. Beckett ordered no studies and performed no procedures designed to reduce Claimant's symptoms. The ALJ suggested that if Claimant's symptoms were severe enough to disable him, a more

46

intensive treatment plan would have been followed. The ALJ further explained that an opinion by Dr. Beckett finding Claimant disabled was not entitled to any special weight, because it encroached on the administrative determination of disability reserved for the Commissioner. Thus, depending on the context and intent of the statement, the ALJ properly explained the weight she afforded to it and provided reasonable grounds for her determination.

### C. Listing 1.04(A)

Claimant contends that the ALJ failed to fully consider and explain her finding that Claimant did not meet or equal Listing 1.04. At the administrative hearing in 2015, Claimant argued that he met Listing 1.04(C). (Tr. at 36). However, at present, Claimant apparently abandons that position, as he makes no such argument in his brief and offers no evidence to show that he meets or equals Listing 1.04(C). While Claimant does not specify in his brief which paragraph of Listing 1.04 he believes he meets, his argument references some of the criteria of Listing 1.04(A). Therefore, the undersigned examines that paragraph of the listing.

A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525(a). The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; therefore, the SSA intentionally set the criteria defining the listed impairments at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990).

"For a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

Listing 1.04 is found in the listings for the musculoskeletal system. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 at ¶ 1.04. To meet or equal this listing, Claimant must show a disorder of the spine (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) with one of the following:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

*Id.* To meet Listing 1.04(A), Claimant must establish "that each of the symptoms are present, and that [he] has suffered or can be expected to suffer from nerve root compression continuously for at least 12 months." *Radford v. Colvin*, 734 F.3d 288, 294 (4th Cir. 2013) (citing 20 C.F.R. § 404.1509). Claimant is not required to show "that each symptom was present at precisely the same time—i.e., simultaneously—in order to establish the chronic nature of his condition. Nor need [he] show that [his] symptoms

were present ... in particularly close proximity." *Id.* However, he must prove a chronic condition, with symptoms present over the requisite period of time as evidenced "by a record of ongoing management and evaluation." *Id.* (quoting 20 C.F.R. Part 404, Subp. P, ¶ 1.00D).

Here, the ALJ considered Listing 1.04(A), but concluded that Claimant did not meet that listing, because he did not have evidence of nerve root compression that was continuous for a twelve-month period and was accompanied by all of the symptoms outlined in Listing 1.04(A). (Tr. at 17). The ALJ acknowledged that prior to June 2012, Claimant had symptoms of nerve root compression. However, he underwent back surgery; by August 2012, he had none of the symptoms necessary to meet the listing. Discussing an examination of Claimant performed in August, the ALJ indicated that Claimant had good motility, motor strength of 5/5 in the upper and lower extremities, normal muscle bulk and tone, intact sensory response, normal gait, and a negative straight-leg raise test bilaterally. The ALJ added that in May 2013, Claimant's films showed no evidence of residual or recurrent disc herniation, and his leg muscles were satisfactory, although his dorsiflexors on the right may have showed some weakness. (*Id.*).

Claimant argues that this explanation was inadequate, because the ALJ overlooked symptoms that fulfilled the criteria of Listing 1.04, specifically referring to Dr. Ignatiadis's RFC assessment. However, as discussed above, Dr. Ignatiadis's RFC assessment is void of any physical findings; accordingly, it does not corroborate the presence of symptoms necessary to meet the listing. Moreover, Claimant references no other evidence in the record to substantiate his claim that the ALJ overlooked critical information relevant to Listing 1.04. The Fourth Circuit has repeatedly advised that

district courts must not engage in fact-finding on review, which should have been done at the administrative level in the first instance. *Fox v. Colvin,* 632 Fed. Appx. 750, 754 (4th Cir. 2015) (quoting *Radford,* 734 F.3d at 296) (holding that it is not the province of the district court to "engage in these [fact-finding] exercises in the first instance.'). The record does not plainly demonstrate that all of Listing 1.04(A)'s symptoms were present between April 2013 and April 2014, or after December 2014. Claimant bears the burden of proof at step three of the sequential process. *See Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017) ("The claimant bears the burden to make the requisite showing during the first four steps. If the claimant fails to carry that burden at any step, she is determined not to be disabled.") (internal citation omitted). Without more, Claimant has not carried his burden. Accordingly, the undersigned **FINDS** no error in the ALJ's assessment of Listing 1.04(A).

### D. Testimony of Vocational Expert

Claimant complains that the ALJ disregarded testimony by the vocational expert and failed to ask the vocational expert proper hypothetical questions. Both of these criticisms are based upon Claimant's contention that the ALJ should have incorporated the opinions of Dr. Ignatiadis and Dr. Beckett into the RFC finding.

In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989); *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into a RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the

claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted).

In this case, the ALJ found Claimant capable of doing less than a full range of sedentary work. The ALJ asked the vocational expert multiple questions in which the ALJ incorporated various limitations, including a hypothetical question that mirrored the RFC finding. (Tr. at 73-77). Even when assuming all of the limitations set forth in the RFC finding, the vocational expert identified jobs that Claimant was capable of doing at the sedentary exertional level. Therefore, the ALJ fulfilled her mandate with respect to the vocational expert's testimony.

Although Claimant couches his challenges in terms of the adequacy of the hypothetical questions posed and the weight given to the vocational expert's testimony, these challenges are, in effect, additional attacks on the ALJ's RFC finding. SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an

individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ must assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR § 416.945(b-d). Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780

F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

However, the scope of "judicial review in social security cases is quite limited." *Smith v. Colvin*, No. 1:14-29870, 2016 WL 1249270, at *1 (S.D.W. Va. Mar. 29, 2016). "When reviewing a Social Security disability determination, a reviewing court must uphold the determination when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Cuffee v. Berryhill*, No. 15-2530, 2017 WL 715070, at *2 (4th Cir. Feb. 23, 2017) (internal citations and markings omitted). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion" and it "consists of more than a mere scintilla of evidence but may be less than a preponderance." *Id.* (citation omitted). Significantly, in reviewing for substantial evidence, the court must not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]" and "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* Furthermore, the ALJ is solely responsible for assessing a claimant's RFC. 20 C.F.R. § 404.1546(c).

The ALJ performed a thorough assessment of the evidence in arriving at Claimant's RFC. (Tr. at 17-21). She conceded that Claimant had significant pain and chronic back and neck impairments. She reviewed the medical history longitudinally, identifying relevant records and statements that helped to provide a picture of how Claimant's symptoms had waxed and waned over time. The ALJ concluded that Claimant's musculoskeletal problems were exacerbated by his highly demanding work as a rock and water truck driver. The ALJ considered the RFC assessments provided by

agency consultants, as well as Dr. Beckett and Dr. Ignatiadis, and reconciled the vastly different opinions by carefully comparing the opinions to the other evidence. The ALJ did not fully adopt any of the medical source statements and provided clear and logical reasons for her conclusions. The ALJ complied with the regulations by conducting a function-by-function assessment and supported her determinations with reference to the evidence. The ALJ also correctly considered Claimant's performance of physically challenging work during much of the alleged period of disability, noting that while he suffered from chronic pain, Claimant was still able to complete basic work activities required by his employment. The ALJ took into account that Claimant was no longer able to work at that exertional level effective December 2014, as indicated by his testimony and by Dr. Beckett's decision to preclude him from returning to his position as a water truck driver. Ultimately, the ALJ made an RFC finding that incorporated the limitations established by the record as a whole.

Therefore, the undersigned **FINDS** that the ALJ's hypothetical questions to the vocational expert and the ALJ's decision to disregard testimony based upon hypothetical questions that did not reflect the RFC finding complied with Social Security rules and regulations.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**, (ECF No. 10); Defendant's motion for judgment on the pleadings as articulated in her brief in support of Commissioner's decision be **GRANTED**, (ECF No. 15); the final decision of the Commissioner be **AFFIRMED**, that

this action be **DISMISSED**, with prejudice, and removed from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Chief Judge Johnston, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** November 20, 2017

Cheryl A. Eifert
United States Magistrate Judge